UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRENDA MINTIE, ) | CASE NO. 5:12CV1414 |
| ) | |
| Plaintiff, ) | JUDGE CHRISTOPHER A. BOYKO |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| CAROLYN W. COLVIN[1], ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Brenda Mintie ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND this matter for further analysis of the treating physician's rule and identify medical records that support his conclusions.

I.  **PROCEDURAL AND FACTUAL HISTORY**

On November 2 and 16, 2007, Plaintiff applied for DIB and SSI, respectively, alleging disability beginning on February 28, 2006. ECF Dkt. #11 ("Tr.") at 18.[2] Plaintiff's date last insured is September 30, 2011. *Id.* The SSA denied Plaintiff's application initially and on reconsideration.[3] Tr. at 68-71. Plaintiff requested an administrative hearing, and on February 18, 2010, an ALJ conducted an administrative hearing *via* video conference and accepted the testimony of Plaintiff,

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

[3]Plaintiff filed previous unsuccessful SSI and DIB claims in 2005, which were not appealed. Tr. at 93-96.

who was represented by counsel, and Maurice A. Demers, an impartial vocational expert ("VE"). Tr. at 36-67. On July 23, 2010, the ALJ issued a Decision denying benefits. Tr. at 18-35. Plaintiff filed a request for review, which was denied by the Appeals Council on April 12, 2012. Tr. at 1-5.

On June 5, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On December 19, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #13. On January 29, 2013, Defendant filed a brief on the merits. ECF Dkt. #14. Plaintiff filed a reply brief on February 10, 2013. ECF Dkt. #15.

## II.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-two years of age on the alleged onset date, suffered from asthma, hypertension, right shoulder pain of uncertain etiology, cerebral vascular accident which left residual right upper and lower extremity impairments, and depressive disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 20. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404-1525, 404.1526, 416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 20.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b) and 416.967(b) except that she is further limited as follows: She should no more than occasionally bend, twist or crouch; She can perform indoor work with no concentrated exposure to dust, fumes, strong odors, humidity or temperature extremes; She can no more than occasionally reach overhead with her right upper extremity; She should avoid concentrated exposure to hazards such as unprotected heights and moving machinery; and she can perform simple one to two step tasks with no more than occasional interaction with coworkers and supervisors and no interaction with the general public.

The ALJ ultimately concluded that, although Plaintiff had could not perform her past relevant work as a secretary, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including that of small product assembly, electronic assembly,

and sewing machine operator. Tr. at 29. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## **V.    ANALYSIS**

Plaintiff advances three arguments in this appeal, all of which are predicated upon Plaintiff's mental impairments. First, Plaintiff contends that the ALJ did not provide any explanation for his decision to discredit her testimony at the hearing regarding the limitations she suffers as a result of her mental illness. Second, Plaintiff contends that the ALJ did not provide any explanation for his decision to give limited weight to the opinions of two treating physicians, and one consulting physician, all of whom opined that Plaintiff suffered limitations that prevented full time work. Finally, Plaintiff contends that the VE's testimony at the hearing was inconsistent with the ALJ's conclusion that Plaintiff must be limited to one or two step tasks. Because Plaintiff's second argument has merit, the undersigned will address Plaintiff's second argument out of order.

### **A.    Hearing testimony**

Plaintiff testified that she lives with her boyfriend of six years. Tr. at 31. Plaintiff further testified that she had lost fifty-five pounds since 2006 after she suffered a stroke and mini-strokes, and was diagnosed with high blood pressure and high cholesterol. Tr. at 42. She currently weights 200 pounds.

-4-

Plaintiff explained that she attended college in the past, completing approximately thirty-four credit hours, but was unable to complete her course work due to mental and physical problems, as well as side effects of her medication, which caused her to fall asleep while driving. Plaintiff testified that she is prescribed three times the normal dose of a particular medication, although she did not identify the medication. Tr. at 43. She conceded that she also suffered from "pharmaceutical problems" that interfered with her ability to attend classes and complete her course work. She cited an instance when she registered for the wrong classes, which she attributed to her depression and the medication she was prescribed at the time. Tr. at 43.

Prior to her employment with her father, Plaintiff published a local newspaper about the underground music scene for approximately ten years. Tr. at 57. Plaintiff testified that, in the end, she could not continue publishing the newspaper, and she realized that she did not have the proper skills to enter the workforce. Tr. at 58. She further testified that, although she had job offers, she did not accept them because they were either too far away or they did not pay enough. Plaintiff described her efforts to find a job as "overwhelming." Tr. at 58.

Plaintiff's last job was a secretarial position with her father's company. She claims that her father fired her in 2006 because of her physical illness. Tr. at 47. Plaintiff testified that, prior to her stroke in 2008, she suffered from extreme stress, depression, panic attacks, and memory problems. Nonetheless, she collected twenty-six weeks of unemployment after working for her father, and she testified that she was ready and able to work during that time. Tr. at 46.

Plaintiff testified that her father "terrorized" her throughout her life, and that she engaged in self-mutilation as a result of their relationship. Tr. at 49. Plaintiff explained that she was injured in a motor vehicle accident in 2008 (prior to suffering a mini stroke a few months later) and that the accident was especially upsetting to her because the car she was driving was the only car she had ever purchased for herself. Tr. at 50. As a result of the accident and the subsequent stroke, Plaintiff suffered parasthesias of her right hand and foot, as well as significant memory loss. Tr. at 51. Plaintiff has forgotten to pay bills and has had difficulty navigating household emergencies. Tr. at 52. Plaintiff also suffers panic attacks, which she described as lasting approximately five minutes

and causing a tightness in her chest. Tr. at 53. She explained that she treats her panic attacks by "remov[ing] [herself] from the situation." Tr. at 54.

Plaintiff testified that her last physician's appointment was with Dr. Bentley, who had retired prior to the hearing. Tr. at 54. She further testified that she saw a therapist a couple of times a month. Tr. at 54. At the hearing, Plaintiff described occasional difficulty motivating herself to perform household tasks. She further testified that she no longer "go[es] out" anymore. Tr. at 56.

### B.     Medical records

Medical notes from Source One Group, which were dated from January 26, 2005 through December 2007 establish that Plaintiff was taking medication, Effexor, Klonopin, and Topamax, to treat anxiety and depression. She reported no side effects and that she was able to control her symptoms and cope with her increased stress due to her personal relationships. Tr. at 310-19. Plaintiff indicated at her initial appointment that she had struggled with depression dating back to 1997. Notations in the medical notes indicate that she had been treated at Source One dating as far back as 2001. Tr. at 303-304.

Plaintiff was initially treated by Humayun Chughtai, M.D. at Source One. Tr. at 327. However, Dr. Chughtai left Source One in July of 2007. As a consequence, Plaintiff began treatment with Leslie Netland, Psy.D., on July 25, 2007. Tr. at 309. Plaintiff's medical records from Source One reveal that she was regularly noted to be doing well with no particular concerns and was observed to have a euthymic mood and broad-range affect during this time. Tr. at 310-19.

In July 2007, Plaintiff reported looking for work through temporary staffing agencies and stated that she did not feel skilled enough to get a job that she wanted. Tr. 344. In August 2007, Plaintiff stated that she had a strong desire to work but did not feel competent or up to date with computer or accounting skills. She was also insecure about her weight. She expressed an interest in culinary classes but was concerned about her lack of experience. Tr. at 340. At her next visit, and despite the fact that she attributes her self-mutilation to her relationship with her father, she reported feeling depressed that her father would not give her a job but that he wanted her to work or get on welfare. Tr. at 339. Plaintiff felt that her ability to work was limited only by tendonitis. Tr. at 339.

On December 5, 2007, Dr. Netland completed a mental functional capacity assessment, wherein he concluded that Plaintiff was not significantly limited in her ability to understand, remember, and carry out short, simple instructions or make simple work-related decisions. Tr. at 346-47.  However, Dr. Netland further concluded that Plaintiff was markedly to extremely limited in her ability to maintain attention and concentration for extended periods of time, and markedly limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to perform activities within a schedule, maintain regular attendance, and within customary tolerances, and to work in coordination or proximity with others without being distracted by them.  Tr. at 36.

Dr. Netland also completed a state agency questionnaire in January of 2008.  Dr. Netland opined that Plaintiff was "challenged and limited by tasks that require sustained mental effort, at times losing track of purpose and motive."  Tr. at 295.  He further opined that her "[p]ace and momentum are significantly compromised by low, variable energy" and she is "[e]asily frustrated by typical demands of life."  Tr. at 295.  Finally, Dr. Netland observed that, although Plaintiff had demonstrated "marginal improvements," those improvements had required "continuous monitoring and support."  Tr. at 296.

That same month, Plaintiff left Dr. Netland's care and began treatment with Karam Radwan, M.D. According to Dr. Radwan's medical notes, Plaintiff exhibited a full range affect congruent to her mood and was diagnosed with mild recurrent major depressive disorder and prescribed medication, which decreased her symptoms by her next visit in January 2008. Tr. at 363-65, 366. Dr. Radwan further noted that Plaintiff showed "no depressive symptoms" and her mood was "entirely normal with no signs of depression or mood elevation." Tr. at 366.  In March 2008, two weeks after Plaintiff was in a car accident, Dr. Radwan again indicated that Plaintiff had experienced a decrease in depression, had no side effects, a mental status examination showed no gross abnormalities, her mood was euthymic with no signs of depression, her speech was normal, and she was fully oriented with no signs of anxiety.  Tr. at 671.

On April 1, 2008, state agency physician Melanie Bergsten, Ph.D., observed that Plaintiff was capable of performing her own activities of daily living, had moderate limitations in her ability to maintain social functioning and concentration, persistence, and pace. Tr. at 402. In making her assessment, Dr. Bergsten noted that Dr. Netland's opinion that Plaintiff would have significant limitations was not consistent with treatment notes, as medical records from 2007 and 2008 showed that Plaintiff frequently had normal mood with no depression. Tr. at 406-08. Karen Stailey-Steiger, Ph.D. affirmed Dr. Bergsten's conclusions. Tr. at 470.

In May 2008, Dr. Radwan again noted that Plaintiff was stable; she expressed "no psychiatric complaints"; she had no side effects from her medication, she described no depressive symptoms; she was friendly, attentive, communicative, and relaxed; her mood was "entirely normal with no signs of depression or mood elevation"; and her affect was appropriate, full range, and congruent with her mood. Tr. at 669. Two weeks later, Dr. Radwan noted that Plaintiff was doing well on Cymbalta with "no depression evident" and no serious abnormalities upon mental status examination, and a normal attention span. Tr. at 468. In June 2008, Plaintiff returned to the Counseling Center of Wayne & Holmes Counties after Dr. Radwan left his practice. Tr. at 468, 480. A mental status examination was normal except Plaintiff had a depressed mood. Tr. at 480.

During a July 15, 2008 examination at the Counseling Center, Plaintiff was oriented, had fair insight and judgment and a sad and flat affect. P.E. Bentley, D.O., opined that Plaintiff demonstrated "clear evidence of being sad and blue most every day, most of the day for the past two weeks," despite being prescribed Effexor, Topamax, and Klonopin. Tr. at 549-51. On December 2, 2008, Dr. Bentley observed that Plaintiff's judgment was intact and she was able to concentrate although she had some symptoms secondary to her mini-stroke in August. Tr. at 477. Two weeks later, Dr. Bentley noted that Plaintiff was "very bright." Tr. at 26, 546-47. Her depression and anxiety were noted to be only "mild," and she had good hygiene and grooming with no problem in judgment or orientation. Tr. at 547.

However, on December 2, 2008, Plaintiff asked Dr. Bentley to respond to an "inquiry from her attorney who is helping her with her disability claim." Tr. at 477. According to his medical notes, Dr. Bentley conducted a "mini mental status" and concluded that her short and long term

-8-

memory were somewhat impaired. Tr. at 477. Dr. Bentley further concluded that Plaintiff is markedly impaired in her ability to remember, understand, and follow simple directions, and extremely impaired in her ability to perform work activities at a reasonable pace, and to be punctual. Dr. Bentley attributed Plaintiff's limitations to her "extreme psychomotor retardation," ongoing depression, and "her personality style." Tr. at 477. Dr. Bentley also cited Plaintiff's ongoing panic attacks as prohibiting Plaintiff from maintaining gainful employment. He opined that speech therapy would not "significantly help her to interact" or make her "capable of holding down a job." Tr. at 477.

In January 2009, Dr. Bentley indicated that Plaintiff was doing well, had a good affect and a euthymic mood, was working on her disability application, and had decreased her daily dosage of Effexor due to an increase in her blood pressure. Tr. at 608. Dr. Bentley described Plaintiff as having good affect. In February 2009, Dr. Bentley noted that Plaintiff was doing "fairly well" apart from the fact that she had recently been diagnosed as pre-diabetic. Tr. at 604. He increased her daily dosage of Effexor (half way between her original dosage and her current dosage), because Plaintiff's irritability had increased, but her blood pressure had "come way down, well within the normal range." Tr. at 604. In April 2009, Dr. Bentley indicated that Plaintiff had stress with her boyfriend but was better on an increased dose of Klonopin. Tr. at 596. In June 2009, Dr. Bentley noted that Plaintiff was tolerating her medicine, her relationship was less tumultuous, and she was "doing fairly well on the med[ications] at this point." Tr. at 591. Later that month, Dr. Bentley indicated that Plaintiff was "looking good today" with a euthymic mood. Tr. at 588.

Plaintiff underwent a consultative examination with John Comley, Psy.D., in October 2009. Tr. at 773. Dr. Comley concluded that Plaintiff was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, as well as markedly limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 778. He further recommended that Plaintiff should be considered "psychologically disabled," and he concluded that she was unemployable. Tr. at 777-

778. In November 2009, Plaintiff reported that her depression and anxiety were "better," her sleep and appetite were good, and she had no side effects from her medication. Tr. at 710.

### C. The ALJ's decision

Plaintiff contends that the ALJ erred in giving little weight to the opinions of two treating physicians and one consulting physician, all of whom agreed that Plaintiff was incapable of sustaining full time employment. Plaintiff further argues that, even if the ALJ's stated reasons for rejecting the opinions of Drs. Netland, Bentley, and Comley is supported by substantial evidence, this matter should be remanded nonetheless because the ALJ did not provide any citation to the medical records to support his conclusions.

In his decision, the ALJ attributed less weight to the opinion of Leslie A. Netland, Psy.D., Plaintiff's treating psychologist, because his findings were not consistent with his treating records, the treatment records from the Counseling Center for Wayne and Holmes Counties, or the treating records of Karam Radwan, M.D. However, the ALJ stopped short of providing citations to the treatment record that conflicted with Dr. Netland's conclusions regarding Plaintiff's limitations. Defendant's brief contains a long list of citations to the treatment records, which reflect Plaintiff's consistently euthymic mood. However, Plaintiff argues that the citations to the treatment records in Defendant's brief constitute *post hoc* rationalizations of the ALJ's decision, which should be rejected by the Court.

The ALJ also rejected the conclusions of Dr. Bentley because Dr. Bentley "opined that [Plaintiff's] symptoms would be ongoing shortly after her stroke and did not take into account improvement he [sic] made with physical therapy and rehabilitation following her stroke." Tr. at 27. The ALJ reached this conclusion despite Dr. Bentley's observation that speech therapy would not "significantly help [Plaintiff] interact" or make her "capable of holding down a job." Tr. at 477. The ALJ further stated that he gave "less weight" to Dr. Bentley's opinion because "it was a solicited opinion to help [Plaintiff] obtain disability benefits and was not consistent with the rest of the medical records." Tr. at 27. With respect to the opinion of Dr. Comley, the ALJ wrote that he "discounted" the opinion because Dr. Comley saw Plaintiff on only one occasion.

-10-

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). The ALJ must afford controlling weight to the opinion of the treating physician if the opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

-11-

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377.

Here, the ALJ concludes that the opinions of the treating physicians and the one-time consulting physician are not supported by the medical records. Although the ALJ articulates his reason for rejecting the opinions of Drs. Netland, Bentley, and Comely, he provides no citations to the medical record to support his stated reason for rejecting their opinions. Therefore, in order to determine whether substantial evidence supports the ALJ's conclusions with respect to the weight given to the opinions of Drs. Netland, Bentley, and Comley, the Court is required to search out the evidence that supports the ALJ's conclusions and assume the ALJ relied on it. That is not this Court's function. See *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996) ("[W]e cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Without the context and analysis that supports the ALJ's conclusion, the undersigned recommends that the Court conclude that it cannot meaningfully review the ALJ's decision. Accordingly, remand is necessary for the ALJ to identify the medical records that support his conclusions.

Furthermore, with respect to Dr. Comley's opinion, the ALJ added the additional reason that he gave little weight to the opinion of Dr. Comley because he was a one-time examiner. While this reason might be valid in another case, the opinion of the one-time examiner in this case is consistent with the opinions of both treating physicians. Moreover, the ALJ appears to give substantial weight to the opinion of Dr. Bergsten, the file-reviewing agency physician, and the only physician in the record that considers Plaintiff to be capable of full-time employment. The ALJ's apparent reliance on Dr. Bergsten's opinion is completely at odds with his rejection of Dr. Comley's opinion, since Dr. Bergsten never examined Plaintiff, and her file review was undertaken prior to Plaintiff's stroke in 2008. In addition, Dr. Bergsten asserts that Plaintiff's ability to care for herself, that is, prepare simple meals, do laundry, simple housekeeping and shopping) constitutes evidence of her ability to perform full-time work. The Sixth Circuit in *Gayheart* rejected the supposition that a claimant's ability to perform his or her activities of daily living contradict a treating physician's opinion that the claimant cannot perform work-related activities on a sustained basis. *Gayheart*, 710 F.3d at 377.

## VI.   CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND this matter for further analysis of the treating physician's rule and identify medical records that support his conclusions.

DATE: July 17, 2013

                                         */s/George J. Limbert*
                                         GEORGE J. LIMBERT
                                         UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).